Good morning, everyone. Our first case up this morning is 22-3179 United States v. Williams. Good morning, Mr. Pickup. Good morning. Thank you, and may it please the Court. Edward Pickup for Appellant Millard Williams. For three reasons, Williams' conviction and sentence for distributing fernal fentanyl warrant reversal. First, the District Court mistakenly deemed fernal fentanyl an analogue of fentanyl, subject to a mandatory minimum 10-year sentence. But the statutory definition of controlled substance analogue applies, and substances cannot be analogues if they are themselves controlled substances, as is fernal fentanyl. Setting aside the statutory definition, as the government urges, is unworkable, requiring District Courts to independently set the test for when one substance is sufficiently likened without statutory guidance. Second, the District Court failed to suppress critical evidence that the government seized in violation of the Fourth Amendment. In Bowman, this Court held that police could not use suspicion that a house may be a drug den to stop all cars leaving the property. So, too, here, police could not use suspicion about a Chicago address to seize, quote, any parcels en route to that address. The District Court erroneously approved the seizure only by— When we look at the analogue of fentanyl in the Johnson case, how are we able to distinguish that case from what we have in front of us on that first issue? So, I think Johnson is not controlling here for at least three reasons. The first is that this Court has repeatedly held in cases like Gray v. Hardy that a decision for plain error is not a decision on the merits. That leads me to my second point, which is, I think, based on the standard for plain error, this Court will sometimes— What do we do, though, with the reasoning in Johnson? So, I think that— So, we set aside the merit question, but looking at the reasoning of Johnson. Well, so, I think there are, then, two questions on Johnson. The first is, is it binding on this Court? And, second, is the reasoning persuasive and should this Court follow it? And I take Your Honor's question to be getting at that. The second point is, is the reasoning persuasive? And with all respect to Judge Jackson-Aquini, I know you wrote Johnson. I don't think that the reasoning in Johnson is exactly right, and I think that's understandable, because there was no lower court opinion in Johnson. That's why it was plain error. There were three pages of relevant briefing from the appellant. An oral argument, the Court asked just one question on that issue, which was, how could the issue be a plain error given the second circus decision in McRae? In Johnson, we thoroughly addressed. Maybe the lawyers didn't do as much as they could have or focus on it to the same extent, but the opinion thoroughly addresses the statutory scheme work. So, back to Judge Pryor's question, how do you get around the reasoning and the analysis of the statutory framework that was done in that case? So, I'll address the reasoning in just one second. The first point I'll make is that I don't think Johnson addressed all of the issues that we raised on the first issue. How do you get around the reasoning of the Johnson opinion? So, taking it step by step, and I'm assuming for the purposes of this question that it's not a binding precedent, that that's the takeaway from cases like Gray v. Hardy, that it's just persuasive, and therefore I could distinguish it by just explaining why the reasoning isn't persuasive. And I don't think it's persuasive for a couple of reasons. So, starting with the first move which the court makes in Johnson, which is that there's a meaningful variation between the phrase any analog of fentanyl in the sentencing provisions and the term controlled substance analog in the definition section. With respect, I don't think that analysis is quite right because the court leans heavily, for instance, on Section 841G, which is a provision that applies to controlled substance analogs of GBH. But that provision was added to the statute 20 years after the provisions that we're talking about here as part of the Adam Walsh Child Safety Act in 2006. The provisions that we're talking about here were enacted by Congress in 1986. Very recently in Pulsifer, the Supreme Court said for the purposes of establishing meaningful variation, courts should not look at statutes that were enacted at different times because that's not really indicative that Congress had different meanings in mind. And we think, and this is a position we lay out at length in the briefing, that the very slight difference between controlled substance analog in the definition section and any analog of fentanyl in the penalty provisions is so slight as to make it- But those were enacted at the same time. Back to your argument. Those were enacted at the same time. Different phrases and controlled substance analog is used in other provisions that were enacted either at the same time or around the same time. That's exactly right. But what I want to be really clear on is the only time in the initial legislation that Congress singled out the analog of a particular controlled substance is the fentanyl analog provisions. Every other time in the statute that Congress uses the full phrase controlled substance analog, Congress is referring to a catch-all. It's referring to all controlled substance analogs. That's how Congress uses it in- Isn't that telling, though, that they wanted to differentiate any analog of fentanyl? I actually think that cuts the other way because I think that if you take the government's position, the district court's position in this case, it's that the very slight difference means that district courts were supposed to go out on their own and craft a complicated task for when one substance is like another under the analog of fentanyl provisions. But how does that really help you under the statutory canon that the Supreme Court applies and we apply that where Congress includes particular language in one section but omits it in another, it's intended to have different meanings? Well, a quick point on that is that in Southwest Airlines v. Saxon, the Supreme Court says that really that canon only applies where there's a material variation in terms where it's a really significant change of phrasing. Southwest is- I'm very familiar with that case. That is a very different scenario. And then again, recently in Pulsifer, the court described the canon as readily defeasible. And so I don't think this is a particularly strong canon of interpretation. And here I think all of the indicia suggest that the difference between the two is so slight that Congress meant for the same definition to apply. And I have a couple of arguments on that. The first one is, as I was suggesting earlier, I think it's really quite strange to do what the district court did here, which is to take one prong of the statutory definition section. If you look at the jury instructions in Appendix 179, the definition that the district court eventually adopts here for analog of fentanyl is literally one prong of the statutory test. But courts, it's whether one substance is substantially similar to another's chemical structure. But courts typically take statutory definitions as they find them. They don't pick and choose elements. So I think that's one slightly odd feature of the district court's reasoning. And then a couple of kind of contextual arguments. One is applying the statutory definition of controlled substance analog to the fentanyl analog provisions ensures that the attorney general's scheduling flexibility carries through to these penalty provisions. If you take a look at Section 811 of the statute, that's the provision that gives the attorney general scheduling authority, you'll see that it's kind of the backbone of the act. The attorney general's scheduling decisions have consequences up and down the act for how easy substances are to manufacture, whether they're subject to production quotas, the penalties that apply to those substances. And our reading just means that the attorney general's scheduling decisions carry through to these provisions. So that's our first contextual argument. Our second contextual argument is that the government's reading of the statute means that prosecutors have completely unbridled discretion to prosecute. I want to go back to kind of where we started the conversation. I know we looked at the example that was given in Johnson, but the other one that I wanted to talk about, looking at that statutory canon that Judge Sainee just posed of when it's used in one way, right, in the same statute. So in the penalty section, which is where you're asking us to focus, in 841B7A, when talking about in the penalty section, it specifically references controlled substance analog. However, when looking at the penalty section here, it has only analog of fentanyl. And so is it the suggestion that even though it's within the same statute, that there was a different meaning, or should we read controlled substance analog of fentanyl in this particular section? Is that what you're asking us to do? No, so I just want to be very clear about the first provision Your Honor mentioned, which is 841B7. When Congress uses controlled substance analog there, Congress is using it as a catch-all. It's referring to all controlled substance analogs. The only time in the original 1986 legislation that Congress singles out the analog of a particular controlled substance is in the fentanyl analog provisions. And I think that explains the difference. But doesn't that also demonstrate that there is intended to be a difference? I don't think so, because I think if Congress had spelled out controlled substance analog of fentanyl, that's actually pretty clunky phrasing, because what that really means is controlled substance analog of a particular controlled substance. I don't think Congress needed to specify that it was talking about controlled substances in a provision that had everything to do with fentanyl in the Controlled Substances Act. I think analog made perfectly—just using analog of fentanyl made perfectly clear that the statutory definition applied. And if I can just— But how could you, when a controlled substance, when the particular fentanyl that we're looking for in this case qualifies as a Schedule I, and so it would not qualify under the definition of a controlled substance analog? That's exactly right. In our reading of the statute, it wouldn't qualify because the statutory definition of controlled substance analog is very clear that substances that are themselves scheduled controlled substances don't count. I just also want to underline that we're not arguing that there shouldn't be severe penalties for substances like ferranol fentanyl. The statute sets severe maximum sentences for those substances. You're asking the statutory minimum to be removed. Exactly. Our argument goes to the provision that deals with the statutory minimum. Judges can still sentence defendants who are convicted of crimes involving ferranol fentanyl for a maximum sentence of 20 years. And so it's not like we're arguing that there should be very minimal penalties for this. If I could just address— How do you get around, in the penalty provision, there's the same enhanced penalty for 40 grams or more of mixtures containing fentanyl and 10 grams or more of mixtures or substances containing fentanyl analogs. If we adopt your interpretation, wouldn't that render meaningless the enhanced penalty for analogs that are also listed as controlled substances? No. Well, so to be clear, yes. If you adopt our— How does that make sense given Congress's clear intention here? Well, so I think Congress's intention in these provisions was to ensure that fentanyl and substances that are just as dangerous as fentanyl are subject to harsh penalties. Now, note that the district court's interpretation of analog renders irrelevant whether a substance produces the same effect as a controlled substance. The district court focused only on chemical similarity. And just to drive this point home, there are plenty of very common substances that are chemically similar to controlled substances. An example that the Eighth Circuit gave in Washam is the common food additive, MSG, is chemically similar to GBH. But nobody thinks that MSG should be a controlled substance under the Controlled Substances Act. And the reason that it's not is that the statutory definition of controlled substance analog requires both chemical similarity and functional similarity. But that's not what defendants are being charged with. They're not being charged with possession of that. And the penalty provision here makes clear that Congress wanted these fentanyl analogs treated to the same extent at a lesser amount than fentanyl itself. Again, I think it's because the danger that Congress was confronted with here— I understand why. Right. But your argument would undermine that because as long as a fentanyl analog was listed as a controlled substance, it would not receive that same enhanced penalty. Well, I just want to, again, be very— It might still get a serious penalty. I understand that. But Congress's intent for this particular enhanced penalty, based on 10 grams or more, would be rendered really meaningless in many situations where the fentanyl analog is listed as a controlled substance. It seems to undermine the intent. Well, I think the government's position has oddities cutting the other way in the sense that the provision would apply even to— I'm not asking about the government's. I'm asking my particular statutory construction question, that your argument would render that meaningless. And how do you get around that?  I don't think it renders it meaningless. It still applies to all unscheduled analogs of fentanyl, right? Which the ones you've identified are not ones that are being prosecuted. I think it's only quite recently, I think in the case of fernal fentanyl since 2017, that it's been a scheduled substance. So for the whole rest of that time, it would have fallen under the analog fentanyl penalty provision. And the same is true for plenty of other analogs of fentanyl. There are lots of them. Are there any cases in this circuit adopting your definition of analog of fentanyl? There are not, no. Are there any outside of this circuit adopting your definition? No, although I just want to be clear that not many courts have adopted this. But I think only the Second Circuit has addressed this in McRae, and the Second Circuit agreed with the District Court's reasoning here. If I may, I just want to very quickly make clear that Johnson didn't address a couple of things that we raise in this case. One is our vagueness argument wasn't addressed in Johnson. The second is that in Johnson, the defendant did not contest that the District Court had correctly interpreted analog as a matter of plain meaning of that word. We very strenuously, as a backup position, contest that the District Court got that correct here. Our fallback position is that analog requires both chemical similarity and functional similarity because that's the definition of analog that Congress clearly had in mind in the statutory test. And again, the District Court— But if we don't accept what you're proposing, and that's what we're asking for us to shift the argument a little bit, if we're not accepting that controlled substance analog dictates the definition of analog of fentanyl, where do we go? That's a good question. I'm really good at questions. I can tell. The government admits that the statutory definition, even just on a plain meaning analysis, sheds some light on the plain meaning of analog just as a matter of ordinary statutory interpretation. The District Court clearly felt the same way because it defined analog by reference to one prong of the statutory test. I think the search for ordinary meaning, particularly when we're dealing with a technical term like analog, should go far beyond looking at a solitary dictionary definition, and that's all the District Court did in this case. I think if a court was going to do a full probing analysis of what analog means, I think it would see that analog can mean both chemical similarity and functional similarity, which is exactly the definition that Congress had in mind in the statute. I think the reason that Congress saw functional similarity as so critical is that it's precisely because these analogs are just as dangerous as controlled substances that Congress wanted to regulate them. The chemical similarity of a substance can be either here nor there when it comes to exactly how dangerous the substance is. Can I shift you to another part of your argument? Let's go to sentencing, and then if my colleagues need to go back to sentinel, we can. Tell me about the District Court's misstatement, 25 versus 21, and the context in which the court makes that statement and why that affects Mr. Millard's substantial rights and the integrity of the fairness of judicial prison. I'm really happy to answer that question. I'd like to reserve some time for rebuttal. Is it all right if I— You asked for two minutes, so you still have— Sure. I'd like a little more than two minutes if that's okay. If you could just answer her question, please. We'll see if we have additional questions. Thank you very much. I appreciate it. I'm sorry, Your Honor. If you look at the relevant paragraph of the sentencing explanation, I think it's the short appendix 97, the carryover paragraph, the District Court only mentions 25 convictions once, but it relates to the court's consideration of two of the 35538 factors, so it relates to Mr. Williams' risk of recidivism, whether he really learned his lesson, which goes to respect the rule. Let me ask it a little more directly. Why is not a fair reading of that particular paragraph? Her larger point is he has a lot of convictions, be they 25, be they 21, be they 18 or 27. It's a lot by any measure, and so the large number of convictions means he hasn't learned his lesson. So my response on that would be the government concedes that the District Court referring to 25 convictions was a mistake, and under this court's decision in props, the relevant consideration when the court relies on plain misinformation is whether there was misinformation in the sentencing opinion and there was specific consideration to it. That's the test. That's how plain error cashes out in this context. The government's conceded the error point. They acknowledged that was a mistake. So the only question I think is whether the court paid specific attention to it, and I think it's very clear the court did. Also on the sentencing point— But isn't the question, as Judge Jackson, if you focus on really the context, there was a misstatement. We can all agree with that, but the context, the court's focus was on the volume of convictions, not on 25 being any different than 21. Well, I think there's a significant difference between 21 convictions and 25 convictions because even four convictions is a large number, and so I agree with you that the thrust of what the court was saying is Mr. Williams has a significant criminal history. What the court's doing is looking at Mr. Black's criminal history and comparing it to Mr. Williams' criminal history to explain why there's not a sentencing disparity, and I think to conduct that kind of analysis accurately, the court needs to have in mind a very accurate picture of Mr. Williams' convictions, Mr. Black's convictions, and because the district court misstated the number of convictions, I think that's indicative that the court made a mistake. You are into your rebuttal time. I'm done. Thank you. Mr. Vandenberg? Good morning. Good morning. May it please the court, Cornelius Vandenberg on behalf of the United States. I'd like to begin with the district court's definition of the term analog of fentanyl. Instead of us starting there, let's start with, if we don't mind, the package and the motion to suppress. Yes. I'm confused as to the government's evidence to detain or to seize that package. We focused a lot on the February phone call, but I don't see the connection between the phone call and what was actually seized. So can we talk through that evidence? Yes, Your Honor. With regards to the connection directly between the phone call and the package itself, that phone call identified a specific package. As the defendant was talking to co-defendant Willie Alexander, he talked about instructing him to forward a package with an AK Hong Kong shipping tracking number. He said he would pay him up front consistent with the valuable package of narcotics and stress the need to ship it overnight and to track it. The specific package that was intercepted was mailed to the exact same address, 1008 North Springfield, to the same nominee recipient, Maria Gonzalez. It was shipped on March 2nd, two days after that phone call with Alexander. Does it match the tracking number that we hear on the phone call? No, it was repackaged, Your Honor. Okay. It was two packages from Hong Kong that were then shipped up to this address, 1008 North Springfield, to the specific person at the time, again, two days after that phone call. What evidence do you have that it was repackaged? Your Honor, we have the, at the, during the course of the case, Mr. Alexander, the co-defendant here pled guilty and stated that it was repackaged at the time, contextually. Correct. They talked about receiving two letters, which was the code name they were using for packages, and Millard Williams instructed him to put them together and to send them. So there was evidence of repackaging at the time. And that's where I'm looking. Yes. I'm looking for that information where the instruction is given to repackage. I think that's the puzzle piece that I'm missing. So can you direct me to where it is in the call? It doesn't say explicitly. Again, they're using vague coded language at this point, but he says he received two of them, and he says to ship them up. It doesn't say specifically repackaging, but, again, as of nature, you know, any type of nature, you are going to have to put a new shipping label at it. It is going to be going to a new address. So it's not explicitly stated, but it is going now from Atlanta up to Chicago. And the intercepted package here, again, has the label, has the address, the name, and it has that it was shipped express, consistent with Millard's instructions. It weighs a kilogram, which is consistent with a regular drug distribution amount, as well as consistent with the size of drugs that would justify the cost of Was there a reference in the March 1st call from Williams to Jamison of Black confirming that he had one cavalry in plans for Gonzales? Yes. When he said one cavalry? He says a cavalry, and then he says a whole thing, and he references one, which the government did argue at trial was coded reference to Aquila. Yes. So those were the specific characteristics that caused them to identify this particular package. Of course, that call that I'm referring to was all in the context, as the government set forth in more detail in its brief, of Millard Williams' extensive history and contemporaneous shipment of narcotics, including international parcels to nominee recipients, including leading directly to his address a package from Hong Kong that was intercepted containing narcotics. Should we start back then where you wanted to, and looking at the Johnson case and maybe talking through what did Johnson decide? Yes, Your Honor. As this court stated in Johnson, controlled substance analog is not the same as analog of fentanyl. And when Congress uses two different terms and two different statutes, it means two different things. Controlled substance analog is a term of art created in the analog act. In the contemporaneous anti-drug abuse act, Congress drafted a penalty provision for analogs of fentanyl and declined to use that term of art controlled substance analog. Statutory construction principles presume the Congress acted intentionally and purposefully in using these two different terms. Johnson and McRae recognized the fact that elsewhere in the controlled substance act, it does use the term of art controlled substance analog. Defendant's argument that controlled substance analog and analog of fentanyl are the same term was rejected explicitly in McRae, which pointed to the use of that term of art elsewhere in the controlled substance act. Turning to the purpose of the sentencing provision at issue, as Your Honor stated, the explicit purpose was to enhance sentencing for analogs of fentanyl. Defendant's proposed interpretation would have the perverse result that an unscheduled analog of fentanyl would be subject to enhanced sentencing up to and until the point where it was scheduled. What do we do with the position, though, that by not requiring substantially similar as well as functional similar, we're stripping away Congress's definition of analog? Well, it's not the Congress's definition of analog. Analog is not defined anywhere in the statute. A controlled substance analog does have those two prongs, and that's to take something that would otherwise not be criminalized or subject to the provision and to bring it in. That's what the controlled substance analog definition does with the analog act. When we're talking about something like furinal fentanyl here, it's something that has been scheduled by the DEA. DEA has already made a determination that it has a potential for abuse. So that pharmacological aspect of it does come in. However, once it is a scheduled term in order to be applied to this enhanced sentencing provision, at that point, the plain ordinary meaning of analog is taken into account to find out whether it applies. And that goes to the substantially similar chemical structure, which is what the court found in McCray and in Johnson. Since analog of fentanyl is not defined by statute, the district court properly used the ordinary meaning of the term. As the defendant's contention that the substantially similar language is void for vagueness, that argument has been rejected by several circuits, including this one in Turcotte. However, the term is construed dismissal. But we haven't addressed the fentanyl analog question. We've addressed the other term, but not an analog of fentanyl and void for vagueness. Have we? That's correct. Those are void for vagueness have to do with the analog act language, but it goes to the term substantially similar. And the reasoning of those cases is consistent to show why that is not void for vagueness on its face. However, the terms construed dismissal would not be the appropriate remedy. Defendant's argument pertains solely to the sentencing provision at issue here. And the sentencing provision wasn't determinative here. Defendant was sentenced to 210 months, well in excess of the 10-year mandatory minimum. Unless there are any other questions by the court as to the fentanyl analog, I'll turn to the sentencing issue the court raised earlier. On the sentencing issue, I think we're all in agreement that the court misspoke when the judge said 25 versus 21. You have argued, and I know the defendant has conceded it, but you've argued plain error. Why wouldn't this be a de novo review under our line of cases, U.S. versus Wood and others in Rule 51, where we've been very clear that exceptions to rulings or orders of the court are unnecessary to preserve certain appeals, including those when the district court is giving an explanation of its sentencing. I understand your Honor's question as to why that could apply under that string of cases here. They did not object. I believe that is why defendant conceded that it was a plain error review. They did not object, but just work with me. If they hadn't objected, it seems like this is pretty clearly a de novo review issue, not a plain error. If they hadn't objected, I think that would have been a question raised. It has not been briefed, so I'm not prepared to argue as to whether it should fit within that construct, your Honor. Would it matter? Would it matter? It would not matter because the court did not rely on that misstatement. Even if the court was undergoing a de novo review, the result will be the same. The court considered a broad range of factors, aggravating and mitigating in sentencing this defendant. It's pretty clear that this misstatement made one time after it had correctly calculated the guideline range here, which was a driving factor and making it a 360 months to life advisory guideline range, that this one misstatement did not make a difference. It was made in support of the district court's conclusion that the defendant quote had never learned his lesson. One concern I have is that that could be just speculation. I mean, normally when we're looking at these types of alleged errors and here you all do have the agreement that it's error. We, we may see language from the district court explaining that their sentence would be the same, you know, had they calculated something differently or so forth. So on here we don't have a calculation situation. So, you know, we don't have a guideline that's being disputed. But we don't have any portion of the record that you can point us to. I don't think that suggests she'd make the same decision whether she knew it was 25 or 21. I mean, you say she doesn't rely, but she does say that's just astounding. You've never learned your lesson. It's really important that I look at chances for you to rehabilitate yourself. Um, so, uh, to recap, two questions really there. How is her language not showing she's relying on the facts she just stated? And how are you confident? Do you have anything in the record that suggests she would have made the same decision? Had she not made the misstatement? I, your honor, I would say it's the sentences that you just cited. What comes immediately after that statement, which show, I believe in my interpretation of it pretty clearly. What that was leading to. I believe she initially said 25 arrests, actually 25 convictions. It's going to the statements you just made that he never learned his lesson that she has to consider his recidivism. I think this is different than a lot of cases, uh, because it is so clear, uh, immediately after the context in which the, uh, the court considered this typically, if it was a misstated number of convictions that would come early on in the process, perhaps in calculating the guideline range, and it will be well separated from when the district court was making its analysis of the 3553 factors at issue here. It's pretty clear when she makes that misstatement, she goes immediately to what conclusions she is drawing from that. So how does that not reliance? Because earlier you told us it's clear the district court didn't rely on her misstatement. Sorry. What I'm stating is a reliance on that specific number. I am not doubting that she is relying on the defendant's extensive record of criminal convictions. What we're saying is the difference between 21 and 25. And you can see it almost in the court's phrasing of it as it's searching as to whether it's 25 arrests or 25 convictions. She doesn't repeat 25 conviction. It doesn't become a totemic number. Uh, it goes to the idea of there are a lot of convictions here. And as much as she starts with a specific number, uh, she quickly goes more general. The district court quickly goes more general in its analysis, um, of the repetition, the recidivism that she's taking into account in, uh, in determining her sentence, which as I would, uh, point out, uh, was a sentence of 210 months. Well below 150 months below the low end of the guideline range here. Um, and again, it's within the context, the 3553 analysis is quite extensive in this case. Again, both as the aggravating and mitigating the government's laid out all of those factors. It's brief. I won't repeat them here. Um, but as one part of it, I think it's fair to say the district court was relying on his. And how many convictions remind me? Did the co-defendant have when she was looking at the disparity issue? Do you recall? Uh, your Honor, I don't know, uh, the exact, uh, number that the co-defendant Roland black had. Um, I know he had a more serious conviction. Uh, uh, her point was that defendant had significantly more and that is accurate again, whether it was 21 or 25. Okay. If there are no other questions, uh, I would just say for all the reasons set forth in the brief, the government respectfully asked that the court affirmed the district courts, denial of defendants motions to dismiss the indictment and suppress evidence and affirm the defendants. Thank you, Mr. Vandiver, Mr. Pickup. We'll give you your two minutes. So just two points in rebuttal. Um, first I'd like to address the, uh, reasonable suspicion question. Uh, the first thing the government said when it got up here on the packet on the seizure of the package was that the, a specific package was identified on the calls between Mr. Williams and his co-dependents. I want to be crystal clear that the specific package, the government mentions that is a shipment, um, from Hong Kong to Mr.  Proportionally based on a fragmentary tracking number. It is not the package that the government sees in Chicago. It is our position that there is no evidence to link the specific package seized in Chicago with the purported criminal activity discussed by Mr. Williams and Mr. Alexander. Um, I think the facts here are very close to the facts in Bowman where this court said, uh, that police could not use reasonable suspicion about a particular address, that the address was a drug den to stop all cars leaving that address. I think it's equally true here that the police could not use reasonable suspicion about 1,008 North Springfield to seize all cars. And exactly as in, um, Bowman, it doesn't matter that the police actually intercepted one package here. What matters is the basis for their seizure was overly sweeping. The second point I'd like to make in rebuttal is on the vagueness issue. Uh, I do not believe any of the cases addressing vagueness under the controlled substance analog, uh, test applied to the analog of fentanyl provision because the district court here, uh, selected only part of the test, the chemical similarity prong of the test and courts, including this court in Turcotte and in Washington, the eighth circuit said that the functional similarity prong really helped put defendants on notice. Presumably if a defendant is dealing with a substance that he knows operates in exactly the same way on the human body as a controlled substance, that's a very good indication that it might be chemically similar. That crucial guardrail is missing here. Um, and under the analog test, uh, courts have, I think repeatedly found this at least a debatable question by stripping away most of the test and focusing on one big element. I think the district court rendered this provision. Thank you. Thank you, Mr. Pickup. Mr. Pickup, I understand you and your firm were appointed to represent the defendant in this case. Thank you for your excellent representation. Thanks to both counsel. The case will be taken under advisement.